## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## AT KANSAS CITY

| | | |
|---|---|---|
| **JOE BILHIMER,** | ) | |
| | ) | |
| **Plaintiff, individually and on behalf** | ) | |
| **of all others similarly situated,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **STATE FARM MUTUAL AUTOMOBILE** | ) | **CIVIL NO. 2:19-cv-2248** |
| **INSURANCE COMPANY; AUDATEX** | ) | |
| **NORTH AMERICA, INC.; EXPLORE** | ) | |
| **INFORMATION SERVICES, LLC; and** | ) | |
| **SOLERA HOLDINGS, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

---

## CLASS ACTION COMPLAINT

---

Plaintiff Joe Bilhimer, by and through counsel, brings this Class Action Complaint against Defendants State Farm Mutual Automobile Insurance Company ("State Farm"), Audatex North America, Inc. ("Audatex"), Explore Information Services, Inc. ("Explore"), and Solera Holdings, Inc. ("Solera") (collectively, "Defendants"), on behalf of himself and all other similarly situated persons ("Policyholders"). Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon the investigation of counsel.

## OVERVIEW OF THE ACTION

1.     This national class action and Kansas consumer protection class action arise from Defendants' deceitful system of improperly valuing class members' totaled vehicles, which reduced the amount Defendant State Farm paid to Policyholders.

2.     Plaintiff and the putative National Contract/Common Law Class seek redress for Defendants' wrongful actions, including breach of contract against Defendant State Farm; unjust enrichment against Defendants Audatex, Explore, and Solera; and tortious interference against Defendants Audatex, Explore, and Solera.

3.     Plaintiff and the putative Consumer Protection Class seek injunctions and damages for Defendants' wrongful actions, which are violations of the Kansas Consumer Protection Act (KCPA).

4.     This action seeks damages and injunctive relief on behalf of Plaintiff and a class of similarly situated persons who have been harmed by manipulative and deceptive practices by State Farm and the third-party software system called Autosource, created and marketed to the insurance industry by defendants Audatex, Explore, and Solara.

5.     State Farm has used and continues to use Autosource to systematically undervalue and underpay first party claims of "total loss" to insured vehicles, in breach of its contractual obligations to its policyholders.

6.     Valuation reports generated for State Farm by Autosource systematically make at least two downward adjustments to the estimated "actual cash value" of a policyholder's vehicle at the time of total loss, neither of which is routinely disclosed to policyholders:

7.     (1) by making an arbitrary, consistent, and unsupported deduction to the "value" of "comparison" vehicles (similar, nearby vehicles being offered for sale at the time) by reducing any

advertised price of a comparison vehicle by 8% to allegedly account for "negotiation," i.e., a presumed reduction in the actual sales price of an advertised vehicle reached through presumed negotiation between that seller and a hypothetical buyer; and (2) by systematically adding fictitious "options" packages to "comparison vehicles" that are known not to exist on the policyholder's vehicle, so that a downward adjustment can be made to the estimated actual cash value of policyholder's vehicle (as compared to the comparison vehicles) for lacking those options (which the comparison vehicles also lack, but which Autosource falsely reports them as including).

8.     Through these systematic and deceptive practices buried within Autosource-generated valuation reports, which State Farm does not routinely provide to policyholders, State Farm consistently underestimates and underpays the "actual cash value" of covered vehicles deemed a "total loss," thereby breaching its contractual obligations to policyholders, including its covenants of good faith and fair dealing.  These practices also unjustly enrich Defendants at the expense of State Farm's Policyholders.

## PARTIES

9.     Plaintiff Joe Bilhimer is a resident and citizen of Gardner, Johnson County, Kansas, located in Johnson County.

10.     Plaintiff purchased a comprehensive policy of automobile insurance from State Farm that was in full force and effect as of the date of loss in question, July 28, 2018.

11.     Defendant State Farm is a foreign profit corporation incorporated under the laws of the State of Illinois with its headquarters and principal place of business at One State Farm Plaza, Bloomington, Illinois 61710.  State Farm does business in this District and nationwide by entering into insurance policies with consumers, insuring a large number of vehicles in this District, employing sales agents in this District, maintaining facilities in this District, and has otherwise

conducted continuous and substantial activities within this District which make it amenable to the exercise of personal jurisdiction by this Court.

12.     Defendant Audatex North America, Inc. ("Audatex") is a Delaware corporation in good standing, with its principal place of business at 15030 Avenue of Science, #100, San Diego, California 92128. Audatex, which has described itself as a leading provider of solutions and services to the U.S. automotive insurance claims process industry, does business in this District and nationwide by, among other things, creating total loss valuations for consumers under the trade names of "Autosource" and "AudaExplore."

13.     Defendant Explore Information Services, LLC ("Explore"), is a Delaware limited liability company in good standing, with its principal place of business located at 15030 Avenue of Science, #100, San Diego, California 92128. Explore has held itself out as a premier provider of automotive insurance underwriting and analytics products. Explore does business throughout the country, including in this District, by virtue of its participation and contributions to total loss valuations for consumers in this District, some or all of which may have been provided under the trade names of "Autosource" and "AudaExplore."

14.     In 2013, Audatex combined its U.S. operations with Explore to create AudaExplore, with the intent of offering insurance customers a "one stop shop" for best-in-class claims and underwriting solutions. Some or all of the total loss valuations performed by Defendants in this District have been performed by AudaExplore. AudaExplore is a business unit of Solera Holdings, Inc., which is the parent company of both Audatex and Explore.

15.     Defendant Solera Holdings, Inc. ("Solera") is a Delaware corporation in good standing, with its principal place of business at 7 Village Circle, Suite 100, Westlake, Texas 76262. Solera is the parent company of Explore and Audatex. AudaExplore is described as a business unit

of Solera.  Some or all of the total loss valuations performed by Defendants in this District have

been performed by or with contributions from Solera, through its business unit, AudaExplore.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act

of 2005, 28 U.S.C. § 1332 (d), because the proposed class consists of 100 or more members; the

amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity

exists since Defendants are citizens of a state other than the state of which Plaintiff is a citizen.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff resides

in the District and a substantial part of the events giving rise to the claims occurred in this District.

18.     This Court has personal jurisdiction over Defendants because they regularly

conduct business in Kansas, and because the events that are the subject of Plaintiff's dispute

occurred in Kansas.  Thus, the Court has both general and specific jurisdiction over the Defendants.

19.     Defendants' contacts with this District and the United States as a whole satisfy the

"minimum contacts" test, such that the exercise of jurisdiction over them is consistent with

constitutional due process protections.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action on behalf of himself and all other similarly situated Class

members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

21.     Plaintiff asserts and seeks certification of two classes:

a. a class of State Farm policyholders who have made first party claims for "total

loss" of an insured vehicle and have had their claims estimated and paid by

State Farm based on a valuation report by Autosource and were harmed by State

Farm's breach of contract and other Defendants' violations of other common laws (the "Contract/Common Law Class"), and

b. a class of individual State Farm policyholders residing in Kansas who were affected by Defendants' violations of the Kansas Consumer Protection Act ("the Kansas Consumer Class").

22.     The Contract/Common Law Class is specifically defined as:

All persons and entities that have made first-party property damage claims under contracts of automobile insurance with State Farm that provided for payment of the actual cash value of the policyholder's vehicle (less any deductible) in the event of total loss, and (1) where policyholders experienced a total loss of their insured vehicle covered under such policy, (2) where such claims for total loss were evaluated by State Farm using the Autosource valuation system, and (3) where such claims were paid by State Farm to the policyholder or a lienholder without the parties agreeing to use, and using, an alternative appraisal process described in the policyholder's policy.

23.     The Kansas Consumer Class is specifically defined as:

All "consumers," as defined by K.S.A. § 50-624, who are (1) natural persons residing in Kansas, (2) entered into a written contract of automobile insurance with State Farm that provided for payment of the actual cash value of the policyholder's vehicle (less any deductible) in the event of total loss, (3) experienced a total loss of their insured vehicle and made a claim for such loss that was covered under such policy, and (4) whose claims for total loss were evaluated by State Farm using the Autosource valuation system.

24.     Plaintiff excludes from the proposed classes: Defendants or their related entities; all subsidiaries or affiliates of Defendants; any entity in which a Defendant has a controlling interest; any and all of Defendants' employees, affiliates, legal representatives, heirs, successors, or assignees; any person or entity currently in bankruptcy or whose obligations have been discharged in bankruptcy; any person or entity who has previously commenced and concluded a lawsuit against one or more Defendants arising out of the subject matter of this lawsuit; and any judicial officer assigned to this case and members of the judicial officer's immediate family.

25.     Plaintiff maintains the right to create additional subclasses or classes, if necessary, and to revise these definitions to maintain a cohesive class which does not require individual inquiry to determine liability.

26.     <u>Numerosity</u>. The members of the Class are so numerous that individual joinder of all members is impracticable. The identity and precise number of Class members, though unknown to Plaintiff, is reasonably ascertainable from Defendants' records.   Because of the broad geographic reach and sizeable market share of State Farm in the automobile insurance industry, and the large number of claims that it settles with respect to total loss vehicles, the Classes are estimated to comprise many thousands of people.

27.     <u>Commonality and Predominance</u>. This action involves common questions of law and fact as to the claims of Plaintiff and the other members of the Classes, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

> a.   Whether State Farm breached its insurance contracts, including the implied covenants of good faith and fair dealing, when it systematically reduced the estimated actual cash value of covered total loss vehicles by 8% by consistently and without basis or justification reducing estimated values of comparison vehicles by 8% from published prices allegedly to account for typical negotiation;
>
> b.   Whether Defendant State Farm breached its insurance contracts, including the implied covenant of good faith and fair dealing, when it systematically reduced the actual cash value of covered total loss vehicles by using an automated system that adds options or option packages to comparable vehicles which

were not actually on vehicles used ostensibly to support actual cash value determinations of covered vehicles, so as to reduce the estimated actual cash value of covered vehicles on which State Farm bases its offers of settlement to its policyholders;

c.  Whether Defendants knowingly misrepresented valuations of actual cash value for total loss vehicles to State Farm policyholders;

d.  Whether Defendants knowingly and systematically concealed from policyholders material information about how actual cash value of total loss vehicles was determined;

e.  Whether Defendants had notice that the automated valuation system had in the past wrongfully reduced the estimated value of a policyholder's vehicle by including an option or package of options to comparable vehicles which were not actually on those vehicles;

f.  If Defendants did have notice that the automated valuation system had made such wrongful reduction, did Defendants provide policyholders adequate warnings of this potential;

g.  Whether Defendant State Farm had put in place controls which would prevent other Defendants' wrongful evaluations from harming its policyholders;

h.  Whether Defendants violated the Kansas Consumer Protect Act in how they determined and represented the actual cash value of total loss vehicles to State Farm policyholders;

     i.   Whether Defendants violated the Kansas Consumer Protect Act by representing the valuation system as fair and accurate while knowing that it could wrongfully reduce the amount of a policyholder's recovery for total loss;

     j.   Whether Defendants Audatex, Explore, and Solara have been unjustly enriched at Plaintiff's and the class's expense as a result of the scheme described herein.

28.   <u>Typicality</u>. Plaintiff's claims are typical of the claims of the members of each Class because, inter alia, all Class members were injured through the same alleged misconduct described above.

29.   <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the members of each Class because Plaintiff's interests do not conflict with the interests of the members of each Class; Plaintiff has retained counsel who are competent and experienced in complex class-action litigation, and Plaintiff intends to prosecute this action vigorously.

30.   <u>Superiority</u>. A class action is superior to all other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible and economically impractical for Plaintiff and members of each class, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if members of each class could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same

set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from relitigating the common issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, benefiting from economies of scale, comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

31.     <u>Appropriateness of Injunctive Relief.</u>  Defendants have acted, or refused to act, in a manner that applies generally to the Class, such that final injunctive relief is appropriate to the class as a whole.

## FACTUAL ALLEGATIONS

32.     State Farm advertises and sells comprehensive and collision automobile insurance policies in Kansas and throughout the United States.  According to its own marketing materials, State Farm insures more cars than any insurer in the United States.

33.     For several years, State Farm's automobile insurance business had been a liability which resulted in significant losses from that line of business.

34.     For example, in 2015, 2016, and 2017, State Farm reported losing $4.4 billion, $7 billion, and $2.8 billion, respectively, in underwriting losses on its auto insurance business, despite its leading market share and steady increases in earned premiums each of those years.

35.     State Farm had a few options to combat these losses.

36.     For example, State Farm could have tried to increased revenue by further increasing policyholders' premiums. However, premium prices are a transparent cost for customers and raising this cost too much risks losing customers to more competitively priced insurers.

37.     Another option to reduce losses was for State Farm to reduce the amount it pays out to policyholders with covered loss claims. A reduction in payouts would be less visible to

potential customers deciding between insurance providers, since "average claim payout" is not a readily available measure for consumers. This option would, then, would reduce State Farm's losses while allowing it to maintain its market share and customer base.

38.     State Farm dramatically accomplished this second option in 2018, acknowledging that its $1.1 billion <u>gain</u> from underwriting that year "was driven by lower losses."

39.     The reason for State Farm's stunning turnaround is clear with a closer look at State Farm's 2018 numbers. Compared to 2017, State Farm paid out $3 billion less in "incurred claims and loss adjustment expenses."

40.     In a year, State Farm was able to reduce the amount it payed out to its policyholders by 8.7%, from $34.2 billion to $31.2 billion.

41.     State Farm's reported annual financial results from its auto insurance business for 2015 through 2018 are compiled in the following table:

| State Farm Financial Results By Year -- Auto | | | | |
|---|---|---|---|---|
| Year | Earned Premium | Incurred Claims and Loss Adj. Expenses | Other Underwriting Expenses | Underwriting Gain/Loss |
| 2015 | $36.3 B | $31.0 B | $9.7 B | -$4.4 B (loss) |
| 2016 | $38.8 B | $35.8 B | $10.0 B | -$7.0 B (loss) |
| 2017 | $41.6 B | $34.2 B | $10.2 B | -$2.8 B (loss) |
| 2018 | $42.7 B | **$31.2 B** | $10.4 B | **+$1.1 B (gain)** |

42.     On information and belief, State Farm spends at least $10 billion dollars annually paying incurred claims and other loss adjustment expenses for first-party, physical damage auto

claims. Thus, State Farm has considerable incentive to try to limit and reduce the amount of those payments – which State Farm did significantly in 2018 -- in order to increase profitability.

43.     Across the country, State Farm uses highly-uniform policy provisions to govern its obligations to policyholders who claim first-party physical damage to their covered vehicles.

44.     State Farm's uniform policies give State Farm the choice to settle a loss claim under its collision or comprehensive coverages in one of two ways:

    a. By paying the cost to repair the covered vehicle, minus any applicable deductible; or

    b. By paying the "actual cash value" of the covered vehicle (prior to being damaged), minus any applicable deductible.

45.     Unsurprisingly, State Farm chooses the method to settle a covered-vehicle claim (repair the vehicle or pay "actual cash value") which is less expensive for it.

46.     Put another way, State Farm deems vehicles to be a total loss when it is uneconomical to repair a damaged vehicle, i.e., when the cost to repair the vehicle exceeds the vehicle's "actual cash value."

47.     "Actual cash value" is not a defined term in State Farm's auto policies.

48.     Where possible, State Farm's auto policies are construed in a manner consistent with contract law and insurance law of the state governing the policy. These laws, along with common law implied covenants of good faith and fair dealing, prohibit Defendants from using arbitrary, invalid, unreasonable, and unfair methods to estimate the "actual cash value" of a vehicle immediately prior to a total loss.

49.     These laws also require State Farm to disclose to its policyholders its methodology and basis for estimating the actual cash value of the policyholder's total loss vehicle.

50.     Thus, at a minimum, State Farm is obligated under its automobile insurance contracts with its policyholders to estimate "actual cash value" and settle claims of total loss using reasonable methods and disclosing those methods to its policyholders.

51.     For the past several years, commentators and analysts following the automobile insurance industry have observed that "total loss" claims have been on the rise as a percentage of all physical damage claims involving automobiles.

52.     Commentators have suggested various factors which contribute to the observed rise in "total loss" claims. For example, cost of repairs has increased and an increase in the relative number of older vehicles (which are more likely not worth repairing given their lower value).

53.     Thus, at the start of 2018, State Farm remained the largest insurer of automobiles in the United States, it had just sustained its third consecutive year of multi-billion dollar underwriting losses in its auto insurance line of business, and it was faced with a historical trend of increasing "total loss" claims as a percentage of all auto physical damage claims.

54.     In determining the actual cash value of consumer vehicles, State Farm in many markets across the country uses a third-party valuation service operated by Defendant Audatex in combination with Defendant Explore under the trade name AudaExplore, a business division of Solera.

55.     AudaExplore provides State Farm with estimates, sometimes under the trade name "Autosource Market-Driven Valuation," that purport to provide the actual cash value of total loss vehicles, which State Farm in turn uses to justify the amounts it pays its policyholders as the actual cash value of total loss vehicles.

56. AudaExplore represents to the public that "The breadth and depth of the Audatex used vehicle database makes Autosource the most comprehensive market-driven valuation process available."

57. Though it is the central factor in determining the amount paid out to a policyholder, State Farm does not routinely share Autosource valuation reports with its policyholders.

58. State Farm's uniform auto policies do not disclose to policyholders the existence or identity of the third-party valuation services used by State Farm to estimate and settle total loss claims, like Autosource by Defendant AudaExplore.

59. State Farm's uniform auto policies instead state that State Farm and policyholders must "agree" on the actual cash value of a covered vehicle that has sustained a total loss. However, such policies do not limit either parties' rights in the event that they do not agree on an actual cash value, unless the parties both voluntarily agree to submit a dispute about the actual cash value to a panel of three appraisers, with the parties' sharing the costs of such a process. Such an appraisal process, if used, is binding on both parties. But State Farm's policies do not require either party to submit to such a process, and, on information and belief, such process is rarely if ever used because the costs of employing three, independent appraisers to appraise a covered vehicle would, in most cases, eclipse the amount of a dispute between State Farm and a policyholder about the actual cash value of a covered vehicle.

60. On information and belief, State Farm knows from experience that many policyholders who submit a claim for covered vehicle will trust State Farm's representation of their vehicle's value to be accurate and will not object.

14

61.     On information and belief, State Farm further understands that many policyholders who have suffered a "total loss" of a covered vehicle will not elect to request a formal appraisal by three independent appraisers, which is allowed under State Farm's auto policies.

62.     To the extent State Farm relies on either an policyholder's express agreement, or silence or acquiescence to a "total loss" settlement payment made by State Farm to the policyholder or to a lienholder of the insured, to contend that it has met its contractual obligation to its policyholder, State Farm's reliance is misplaced and invalid because of State Farm's deception, its failure to disclose material information about its claims adjustment process and considerations, and its preceding breach of implied covenants of good faith and fair dealing to its policyholders.

### Facts of Plaintiff's Policy Claim

63.     Plaintiff contracted with State Farm for an automobile insurance policy providing coverage for physical damage for his 2016 Chevy Cruze LT Automatic.

64.     On or around July 28, 2018, Plaintiff's Chevy Cruze sustained damage which State Farm would deem a total loss.

65.     On or around July 28, 2018, Plaintiff's Chevy Cruze had 39,360 miles on its odometer and the State Farm policy covering it was in full force and effect.

66.     Plaintiff timely submitted a claim to State Farm.

67.     On or around July 30, 2018, State Farm assigned Plaintiff's claim a claim number (16-5132-C42) and assigned one of its State Farm claims representative to process the claim.

68.     On or around August 2, 2018, State Farm reported receiving an estimate of the actual cash value of Plaintiff's damaged vehicle as of the time of total loss.

69.    On August 6, 2018, State Farm wrote Plaintiff a letter to advise him of what State Farm had "determined" the "actual cash value" of his insured vehicle to be.

70.    State Farm's August 6, 2018 letter did not enclose any valuation report from Autosource.  It simply provided a breakdown showing a "Source Valuation" amount for his vehicle ($12,634.00), additions for taxes and title transfer, and less his deductible.

71.    With those factors, State Farm represented in its August 6, 2018 letter that the amount of the payment to Plaintiff (which here would benefit his lienholder), or "Total," would be $13,597.57.

72.    Upon receiving State Farm's letter informing him of what the Total payout amount would be, Plaintiff performed his own research using online NADA and Kelley Blue Book guides, as well as reviewing comparable vehicles advertised in his geographic area to determine whether the $12,634 figure accurately represented his Chevy Cruz's value prior to its damage.

73.    Following his review, Plaintiff believed that State Farm's estimate of $12,634 was significantly less than his vehicle's true "actual cash value" immediately prior to being damaged on July 28, 2018.

74.    Plaintiff then asked questions to his State Farm insurance agent and requested additional information about how State Farm had arrived at his valuation of his vehicle.

75.    Four days later, on August 10, 2018, State Farm sent Plaintiff a new form letter, identical in all respects to its previous August 6 letter, except that the "Source Valuation" line, which had previously said $12,634.00, now was changed to "Actual Cash Value" and showed a value of $13,924.00 (an increase of $1,290.00), and a corresponding increase in the "Taxes" to account for this increase in base value.

76.    State Farm did not provide an explanation for State Farm's increase in its valuation.

16

77.     In the August 10 letter, the new total payment that State Farm offered to pay to Plaintiff's lienholder was $15,009.80.

78.     Like the August 6 letter, the August 10 letter also did not enclose any Autosource valuation report.  It enclosed "Settlement Documents" and a return envelope, which Plaintiff did not execute and did not return to State Farm.

79.     Plaintiff did not convey to State Farm or its agent any agreement with either of State Farm's offers.

80.     Without Plaintiff's agreement, State Farm nevertheless issued a payment on August 13 to Plaintiff's lienholder on his covered vehicle, only three (3) days after it provided Plaintiff its new valuation.

81.     Strangely, State Farm's payment to the lienholder was in the amount of $13,597.57. This amount corresponds not to the August 10 "Total" amount, but to the earlier August 6 "Total" amount which valued Plaintiff's vehicle at $12,634.00, as opposed to State Farm's revised valuation of $13,924.00, which would have resulted in a higher Total payment amount of $15,009.80.

82.     Plaintiff did not consent or agree that State Farm's payment reflected or met the "actual cash value" requirement of his coverage.

83.     Moreover, State Farm knew that Plaintiff had expressly questioned the value it ultimately used ($12,634) in making payment to the lienholder.

84.     Following this, Plaintiff requested from State Farm a copy of its evaluation of the actual cash value of his vehicle.  State Farm refused to provide Plaintiff with that information.

85.     Plaintiff later obtained from his insurance agent a copy of the Autosource valuation report that State Farm apparently relied upon for its initial, August 6 offer to Plaintiff.

86.    The Autosource valuation report obtained by Plaintiff showed a "market value" for his insured vehicle of $12,634 (the same amount reported to him by State Farm in its August 6 letter, which did not enclose the Autosource valuation report).

87.    Upon closer inspection of the Autosource valuation report, Plaintiff noticed that the report explained that State Farm had "selected Audatex, an independent vehicle valuation company, to prepare a comprehensive vehicle valuation for your vehicle."  The report further stated that it "was prepared specifically for your vehicle and represents a fair and accurate value driven by the retail used vehicle market."

88.    In the "Valuation Detail" section of the Autosource report, Plaintiff noticed that Audatex had identified four different "comparable" vehicles, identifying the year, make, model, location, transmission, and odometer reading of each vehicle.  Each comparable vehicle was then purportedly used to establish the value of Plaintiff's vehicle. This was accomplished by valuing the "comparable vehicle" and then making "Adjustments" to account for differences between that vehicle and Plaintiff's vehicle, such as differences in mileage and options (like sunroofs).

89.    Plaintiff also noted on his further review of the Report that for each "Comparable" vehicle cited and described in the report, the "base" price (before adjustments) that was identified for the vehicle was almost exactly 8 percent lower than the stated "advertised price" for the vehicle.

90.    The source of this 8% reduction in price was found in the Report's fine print, which claimed that each vehicle's "advertised price" was "adjusted to account for typical negotiation."

91.    State Farm does not disclose anywhere either of its letters to Plaintiff how it was determined that 8% is a fair or accurate "adjustment."

92.    Likewise nowhere in the Autosource valuation report do Defendants provide any statement, notes, or explanation of how AudaExplore had determined that 8% was a fair or accurate

"adjustment," off the top of the published, advertised retail price of every vehicle to account for "typical negotiation."

93.     Further, neither AudaExplore nor State Farm disclose that the Autosource reports recently increased the amount of that hidden adjustment in all similar valuations from 7% to 8%, which directly benefit State Farm by reducing the amount calculated for Total payment to policyholders.

94.     Also, Defendants have not provided to Plaintiff or publicly (which Plaintiff can find) any explanation as to why it had increased that hidden adjustment.

95.     Plaintiff's continued investigation revealed additional problems with the Autosource valuation.

96.     Plaintiff also noticed that in the Autosource valuation report that he obtained from his agent, there was a particular option the Autosource report provided to Plaintiff included an option "Package" for each Comparable vehicle – a "Sun and Sound Package."

97.     Since Plaintiff's vehicle did not have a "Sun and Sound Package" the value of his car was reduced by the amount Defendant Audatex assigned to that package, $815, to compensate for the missing option.

98.     Finding it strange that all vehicle used in comparison had this option package, Plaintiff used the provided VIN number and other information provided for each vehicle and investigated further.

99.     Plaintiff determined through further investigation that none of the vehicles used to establish his vehicle's value had the "Sun and Sound Package."

100.     Defendants, by wrongfully including this option package, made his vehicle appear worth $815 less than it actually was.

101.    Defendant Audatex's system is automated and purports to have a database with a "breadth" and "depth" that makes it the most "comprehensive" process available.

102.    Additionally, State Farm, a market-share leader in auto insurance, has the data and expertise to easily determine whether a vehicle is known to have an options package.

103.    It would defy belief that Audatex's system could innocently and accidently find that every vehicle used for comparison had the same options package when each did not.

104.    Without any other plausible explanation, it must be concluded that Defendants have set up the Autosource valuation system in a manner which can and does attribute options to vehicles used for comparison purposes which they know or should know are not actually found in those vehicles.

105.    Further, Plaintiff contends that Autosource's uniform "negotiation fee" of 8% (recently raised from 7% without explanation) is likewise without any empirical foundation, instead existing only to reduce the Total amount of payout claims to policyholders.

106.    It is clear that these changes to the Autosource valuation system directly benefits the insurer, Defendant State Farm, by systemically reducing the amount it would have to pay its policyholders for their valid claims.

107.    Further, these changes make the other Defendants' valuation service more attractive to State Farm by consistently (and wrongfully) reducing payouts to policyholders which rely on the Autosource valuation.

## CAUSES OF ACTION

### COUNT ONE - BREACH OF CONTRACT
**(By Plaintiff, National Contract/Common Law Class, Kansas Consumer Class)**
**(Against State Farm)**

108.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

109.    State Farm entered into policies of automobile insurance with Plaintiff and other members of the proposed Classes.  These policies govern the relationship between State Farm, Plaintiff, and other Class Members, and they likewise govern and inform how claims for covered losses are handled.

110.    The insurance policies at issue were drafted by Defendant State Farm or its agents.

111.    The insurance policy at issue with Plaintiff is essentially identical in all material respects with the policies entered into with other Class Members.

112.    Plaintiff and other Class Members complied with all material provisions and fulfilled their respective duties with regard to their policies.

113.    The policies of insurance State Farm issued to Plaintiff and other members of the proposed Class state that in the event of a total loss, State Farm will pay the "actual cash value" (ACV) of the loss.

114.    In proposing and making ACV payments under the policies with Plaintiff and members of the proposed Classes, State Farm breached contractual duties to Plaintiff and the proposed class, including the implied covenant of good faith and fair dealing, by:

      a. deducting and not disclosing that it was deducting without inquiry from policyholders, an arbitrary, fixed percentage of the "appraised" value of the insured vehicle as determined by an automated and systematically determined

Audatex valuation, ostensibly based upon "negotiation" from listed prices published by auto dealers; and by

b.   deducting, and not disclosing that it was deducting without inquiry from policyholders, from the "appraised" actual cash value of an insured vehicle amounts ostensibly attributable to phantom or non-existent differences (i.e., options or option packages) between the insured vehicle and the comparison vehicles used by Audatex to calculate a proposed actual cash value of a policyholder's vehicle at the time of the total loss.

115.   State Farm also did not institute sufficient controls on the data it received from Autosource to ensure that options packages which have been fictitiously added to comparable vehicles—and which therefore lower the calculated value of the Policyholder's vehicle—are identified and removed before representing the value to the Policyholder.

116.   State Farm's leading market share and expertise would allow it to determine whether comparable vehicles have these options packages. By choosing to use a faulty auto valuation system, State Farm needed to account for systemic (and favorable) mistakes in that system to meet its contractual obligations to Policyholders.

117.   State Farm was clearly in the better position between the contractual parties to make the determination that its chosen method of valuation included fictitious options packages on comparable vehicles.

118.   State Farm's actions in breaching its contractual obligations to Plaintiff and other Class Members benefitted, and continues to benefit, State Farm.  Likewise, State Farm's actions damaged, and continue to damage, Plaintiff and other Class Members.

119.    State Farm's actions in breaching its contractual obligations, as described herein, are the direct and proximate cause of damages to Plaintiff and other Class Members.

120.    Plaintiff and other Class Members are entitled to recover their actual damages as established through evidence at trial, including damages sufficient to make them whole for State Farm's systematic underpayment of ACV for total loss vehicles, including, but not limited to, the difference between payments made by State Farm for actual cash value in the event of total loss, and the ACV that State Farm would have determined without breaching its contractual obligations to Plaintiff and other Class Members.

### COUNT TWO – UNJUST ENRICHMENT
#### (By Plaintiff, National Contract/Common Law Class)
#### (Against Audatex, Explore, Solera)

121.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

122.    The conduct of Defendants Audatex, Explore, and Solera, as described above and alleged herein, constitutes unjust enrichment, for which Plaintiff and other Class Members are entitled to pursue equitable remedies.

123.    Defendant State Farm made payments to Plaintiff and other Class Members for covered losses to their vehicles which ostensibly represented the actual cash value of their total-loss vehicles, net of deductibles, as determined for State Farm by the automated system created, configured, and operated by Defendants Audatex, Explore, and Solera.

124.    However, in creating, configuring, and operating the nationwide, automated system for determining actual cash value of total loss vehicles, Defendants Audatex, Explore and Solera have wrongfully caused or allowed the system to deduct certain amounts, other than deductibles, from the actual cash value, including (1) arbitrary reductions for so-called "negotiations" off of

published, list prices by dealers, and (2) amounts for fictitious options or option packages ostensibly but not actually included in "comparable" vehicles in order to justify deductions from the estimated value of an insured vehicle, knowing that such amounts would deflate and reduce the amounts State Farm would pay to its policyholders.

125.    The actions of Defendants Audatex, Explore and Solera were unjust and inequitable in that they controlled how their automated Autosource valuation software and system worked, how it selected comparable vehicles, and how it calculated and presented the purported value of comparable vehicles to State Farm for purposes of determining a purported actual cash value of an policyholder's total loss vehicle.

126.    Defendants Audatex, Explore, and Solera knew that their appraisals would be shared with policyholders only upon request by the policyholders, and that most policyholders facing the exigencies of needing to replace a total loss vehicle would not request the underlying appraisal reports from State Farm.

127.    Thus, Defendants Audatex, Explore, and Solera chose to configure their software and system for calculating actual cash value of total loss vehicles to operate in a matter that systematically undervalues the actual cash value of total loss vehicles, in order to save money for their client, State Farm, and thereby continue to maintain the lucrative source of revenues they enjoy from their State Farm relationship.

128.    The actions of Defendants Audatex, Explore and Solera were unjust and inequitable in that they concealed from Plaintiff and other class members that their appraisal reports were arbitrarily and systematically deflating and undervaluing the actual cash values of policyholders' total loss vehicles.

129.     As a result of their unjust and inequitable actions, Defendants Audatex, Explore and Solera were unjustly enriched by receiving fruits of State Farm's underpayments to Plaintiff and other class members, thereby receiving benefits derived from and conferred by the detriments suffered by Plaintiff and the proposed Class members.

130.     Defendants Audatex, Explore and Solera have been unjustly enriched by receiving money from State Farm based at least in part on their unjust and inequitable actions toward Plaintiff and the proposed Class, and based on the underpayments by State Farm to Plaintiff and members of the proposed Class for their total-loss vehicles.  Under such circumstances, Defendants Audatex, Explore and Solera should not, in equity and good conscience, be allowed to retain their unjust enrichment.

131.     Plaintiff and other Class Members are entitled to restitution and other equitable relief.

### COUNT THREE – TORTIOUS INTERFERENCE
### (By Plaintiff, National Contract/Common Law Class)
### (Against Audatex, Explore, Solera)

132.     Plaintiff incorporates by reference all preceding paragraphs as is fully set forth herein.

133.     The contracts of insurance between State Farm and Plaintiff and members of the Contract/Common Law Class obligated State Farm to properly investigate the value of Plaintiff's total loss claim using a fair and statistically valid valuation system and methodology, and then to properly pay Plaintiff and Class Members the appropriate actual cash value of their loss.

134.     At all times relevant hereto, Defendants Audatex, Explore, and Solera had knowledge that State Farm entered into such contracts with its policyholders, including Plaintiff, and that such contracts obligated State Farm to promptly and properly pay total loss claims.

135.    Such knowledge is evidenced by the fact that the Autosource valuation report, prepared by Audatex, in conjunction with Explore and Solera, was prepared specifically for Plaintiff's vehicle at the request of State Farm, based on Plaintiff's vehicle having been deemed a total loss.

136.    Audatex, Explore, and Solera had actual knowledge that State Farm used the Autosource valuation report to adjust total loss claims of State Farm policyholders, including Plaintiff.

137.    Audatex, Explore, and Solera also had actual knowledge that State Farm settles most of its total loss claims that are valued through Autosource valuations on the basis of the amount estimated through the Autosource valuation.

138.    Audatex, Explore, and Solera wrongfully interfered with State Farm's contractual obligations to Plaintiff and its policyholders by knowingly and intentionally selling to State Farm a statistically invalid, arbitrary, and deceptive total loss valuation product and system, for the specific purpose of enabling State Farm to underpay claims of total loss by its policyholders, including Plaintiff, by paying less than the actual cash value of total loss vehicles.

139.    State Farm's breaches of contract that were caused by Audatex, Explore, and Solera's wrongful, intentional, and malicious interference with the contractual rights of Plaintiff and other members of the Contract/Common Law Class include: (a) failing to properly value policyholders' total losses; (b) using an arbitrary and statistically invalid methodology to value policyholders' total loss claims; and (c) failing to pay the proper amounts due to Plaintiff and other policyholders who have experienced a total loss of an insured vehicle.

140.    Plaintiff and other members of the Contract/Common Law Class have suffered damages, in an amount to be established at trial, as a proximate result of Audatex, Explore, and

Solera's tortious interference with the contractual relationship between State Farm and Plaintiff
and the Contract/Common Law Class.

### COUNT FOUR -- VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT
### (By Plaintiff and the Kansas Consumer Class)
### (Against All Defendants)

141.    Plaintiff incorporates by reference all preceding paragraphs as is fully set forth
herein.

142.    Plaintiff and members of the proposed Consumer Protection Class are "consumers"
as defined in K.S.A. § 50-624(b).

143.    Defendants are "suppliers" as defined in K.S.A. § 50-624(1).

144.    Defendant State Farm is a supplier of automobile insurance and of related and
resulting services.

145.    Defendants Audatex, Explore and Solera are suppliers of vehicle valuation services
whose represented accuracy is directly relied on by Kansas insurance customers and others, who
are the ultimate intended consumer of this information whether or not they are aware of these
Defendants' role in establishing vehicle valuations.

146.    Defendants' practices in systematically reducing the "actual cash value" of total
loss vehicles by a fixed percentage (8%) from the published list prices for the selected comparable
vehicles based on purported "negotiations," without disclosing that practice to Plaintiff and
policyholders unless they specifically request a detailed breakdown of the total loss determination,
constitutes a deceptive act or practice that is specifically prohibited by one or more of the
following: K.S.A. §§ 50-626(b)(1)(A), 50-626(b)(2), 50-626(b)(3), 50-626(b)(7).

147.    Defendants have violated K.S.A. § 50-626(b)(1)(A) by knowingly making
misrepresentations or misleading omissions regarding the characteristics, benefits, or quantities of

the actual cash value determination provided to Plaintiff and the proposed Class; by not disclosing that the actual cash value determinations contain (or have been known to contain) systematic reductions based on arbitrary or fictional factors that would not be known or expected by policyholders; and further by representing that the Autosource valuation system accurately provided information on comparable vehicles and fairly represented the actual cash value of the vehicle being valued.

148.    Defendants have violated K.S.A. § 50-626(b)(2) by willfully using falsehoods or ambiguity as to a material fact, namely the composition and validity of the actual cash value determination provided by Defendants to Plaintiff and the proposed Class.

149.    Defendants have violated K.S.A. § 50-626(b)(3) by willfully failing to state material facts, or willfully concealing, suppressing, or omitting material facts when communicating an offer of actual cash value on a total loss vehicle to Plaintiff and members of the Class.

150.    Defendants have violated K.S.A. § 50-626(b)(7) by making false or misleading representations to Plaintiff and members of the Class, knowingly or with reason to know, of facts concerning the reason for, existence of, or amounts of reductions in the actual cash value offers made to policyholders facing total loss of a covered vehicle.

151.    Plaintiff and members of the Class have suffered losses as a result of Defendants' violations of the Kansas Consumer Protection Act.

152.    Plaintiff and members of the Class seek an injunction of Defendants' wrongful and deceptive practices, which are outlined in this action.

153.    Plaintiff and members of the Class bring this action for damages caused by Defendants' acts or practices pursuant to K.S.A. § 50-634(d), and seek their damages, plus their

reasonable attorneys' fees pursuant to K.S.A. § 50-634(e), and any other damages or civil penalties available to them that are deemed appropriate by the trier of fact.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the proposed Classes pray for relief as follows:

a.       That the Court enter an Order certifying both classes;

b.       That judgment be entered against Defendants and in favor of Plaintiff and members of the classes;

c.       That Plaintiff and members of the classes be awarded the full amount of their damages as will be proven at trial;

d.       That Plaintiff and members of the classes be awarded post-judgment interest to the extent allowed by law;

e.       That Plaintiff and members of the classes be awarded their costs of this action;

f.       That Plaintiff and members of the Consumer Protection Class be awarded their reasonable attorneys' fees as allowed by law;

g.       That Plaintiff and members of the classes be awarded restitution or disgorgement of the unjust enrichment of Defendants Audatex, Explore, and Solara;

h.       That Plaintiff and members of the classes be awarded injunctive relief, enjoining Defendants from continuing the practices alleged herein that constitute breaches of contract, fraud, unjust enrichment, and/or violations of the Kansas Consumer Protection Act; and

i.       Such other relief as is just and proper.

**JURY DEMAND**

Plaintiff demands a jury trial of all issues triable by right by jury.

**DESIGNATION OF PLACE FOR TRIAL**

Plaintiff designates Kansas City, Kansas as the place of trial of this action.

Respectfully submitted,


_/s/ Eric D. Barton_
Thomas A. Rottinghaus (KS Bar No. 19081)
Tyler W. Hudson (KS Bar No. 20293)
Eric D. Barton (KS Bar No. 16503)
Sarah Ruane (KS Bar No. 23015)
WAGSTAFF & CARTMELL LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
phone: (816) 701-1100
facsimile: (816) 531-2372
trottinghaus@wcllp.com
ebarton@wcllp.com
thudson@wcllp.com
sruane@wcllp.com


As required, notice of this Action will be provided to the Kansas Attorney General through US Mail:

Kansas Attorney General's Office
Consumer Protection/Antitrust Division
120 S.W. 10th Ave., 4th Fl.
Topeka, KS 66612